**PANTHER OIL & GREASE MANUFAC-TURING COMPANY, a corporation, Appellant,**

v.

**John Norman SEGERSTROM, as administrator of the Estate of H. N. Segerstrom, deceased, Appellee.**

No. 14521.

United States Court of Appeals Ninth Circuit.

June 22, 1955.

R. E. Lowe, Paine, Lowe, Coffin, Ennis & Herman, Ben H. Kizer, Graves, Kizer & Graves, Spokane, Wash., for appellant.

Cashatt & Williams, Jerome Williams, Malott, Dellwo & Rudolf, Spokane, Wash., for appellee.

Before STEPHENS, HEALY, and POPE, Circuit Judges.

HEALY, Circuit Judge.

This is an action for damages predicated on negligence. The appeal is from a judgment for the plaintiff based on a jury verdict in the amount of $111,035, growing out of the destruction by fire of an apple packing shed, a warehouse, and equipment belonging to an estate which appellee was administering. In returning the verdict the jury necessarily found that appellant was negligent and that its negligence was the proximate cause of the loss.

The fire occurred when appellee's unskilled crew undertook to heat a product called Battleship Roof Primer, manufactured by appellant and sold through its agent to appellee. The primer, delivered to appellee three months before the fire, had thickened or jelled while stored, and the purpose of heating it was to render it pliant enough to be applied to the roof. The heating was done by placing the container over an open stove in the center of an empty warehouse some 25 feet from the nearest wall. The warehouse had a concrete floor and a ceiling 18 feet high, and several of its large doors were open. The heating released gases which accumulated in the building and the gases exploded, thus causing the fire.

Battleship Roof Primer is a petroleum product composed of 60% asphalt and 40% naphtha cutting agents, which latter are introduced to render the primer thin enough for ready application to roofs for waterproofing purposes. The cutting agent contains low octane gasoline capable of being converted into motor fuel by raising the octane. One barrel of the primer sold and delivered to appellees was not burned. This barrel on examination was found to contain seven to eight per cent gasoline. The primer has a minimum flashpoint of 80 degrees Fahrenheit.

Battleship primer is intended for cold application, but the labels on the product did not so state, nor did they identify the ingredients composing it. No warning of any kind appeared on the containers. Appellant's sales agent represented at the time of sale that the primer could be applied by unskilled laborers. An in-

struction pamphlet relating expressly to "Battleship Liquid Asbestos Roof Coating"—not specifically to the primer itself—was supplied appellee at the time of purchase. Among the statements contained in the pamphlet was the following: "Do Not Heat or Thin Battleship. Do not heat Battleship with an open flame. Do not thin it. When either is done, the waterproofing qualities of Battelship are damaged. Hence, a proper job is impossible. If, in extremely cold weather, it is necessary to heat Battleship, do so by placing the drum in a warm room 72 hours before the material is to be used." Appellee had forgotten about the pamphlet when the foreman of the roofing crew inquired as to instructions at the time of intended application. The pamphlet, however, as already indicated, related to the roof coating product only, which was to be applied after priming.

The evidence establishes that four well-known manufacturers of similar products which have higher flashpoints have placed clear danger warnings on their containers.

The trial judge, in addition to advising the jury on common law rules of negligence, instructed them to determine whether or not Battleship Primer is a substance requiring a warning label under section 70.74.300, Revised Code of Washington.[1] He told them that a violation of the statute would constitute negligence, and if they found that the primer was of such composition or character as was mentioned in the statute appellant would be guilty of negligence in failing to comply with its requirements.

██ Of the several questions raised by appellant we first notice complaints concerning this instruction. Appellant says that the statute is obsolete. However, it has never been repealed or superseded by later enactments and is still carried in the Washington Code as current law. Counsel argue further that the statute has no application to the case and thus should not have been submitted to the jury. The question whether the product contained substances mentioned in the statute was largely one of fact; and the testimony pro and con on this point was not without conflict. We think submission to the jury of the matter of the applicability of the statute was not error. A third argument is that the court should have analyzed the statute—defined its terms—in submitting it to the jury. The point is not now open since appellant made no request for an instruction of the nature it now says should have been given. It is not disputed that appellant would as a matter of law be guilty of negligence if the statute were applicable.

█ Appellant argues that appellee himself was guilty of negligence, particularly in that he failed to heed the language of the instruction pamphlet quoted above or to show it to his workmen. If he had done so, appellant says, the crew would not have heated the product. Assuming that the pamphlet related intelligibly to the primer, we think the instruction it contained does not reach the point attempted to be made. It actually says no more than that the heating or thinning of the product will damage its waterproofing qualities. The injunctions both as to heating and thinning are directed toward the mere matter of utility. There is no warning or suggestion that the heating of it would or might pose a hazard of any sort or a consequence other than as stated.

█ It is further argued that the heating should not have been undertaken in the confined quarters of the warehouse, but outdoors, and that in this respect also appellee was negligent. Perhaps if we were considering the conduct

1. "Explosive containers to be marked. A person who puts up for sale * * * a package, cask, or can containing benzine, gasoline, naphtha, nitroglycerine, dynamite, powder, or other explosive, or combustible substance, without having printed thereon in a conspicuous place in large letters the word 'Explosive,' shall be guilty of a misdemeanor. (1909 c. 249, § 254; RRS § 2506.)"

of skilled workmen, informed in matters pertaining to the explosive or combustible qualities of gases—more especially when released in confined spaces—we would be impressed by the argument. But there is no evidence here that either the appellee or the members of his crew belong in that category. And we recall the representation of appellant's sales agent that the primer could be applied by unskilled workmen.

At this point, as bearing on the case generally, it will be helpful to note a statement of appellant's research director and assistant vice-president, made while testifying as an expert for appellant. He said that "occasionally these asphaltic materials will jell or thicken in the drums after a period of time. It can occur on very rare occasions." Further, and more significantly, he said that the primer taken from the barrel which had survived the fire could not in all probability have been applied to a roof in the normal manner due to its thickness. Thus appellant's own evidence tended strongly to corroborate the testimony of the opposition as to the unusable condition of the product at hand unless it were heated or otherwise rendered tractable. The ordinary person, or so the jury might think, would naturally resort to heat in such circumstance in order to get the job done, even though he knew heating would impair to some extent the efficiency of the material. So, too, a jury might well think it not unnatural or negligent for such a person to do the heating in a large warehouse with the doors open.

Finally, appellant contends that it was itself guilty of no actionable negligence. It says that appellee, ignoring warnings and disregarding the dictates of common sense, made an unexpected and improper use of the product sold him. The catastrophe therefore was one which it could not reasonably have anticipated.

Whether or not this is so was clearly a matter for the jury to determine in light of the evidence before them. They were carefully and fully instructed on the law pertaining to negligence and to contributory negligence. To overturn the verdict in the circumstances we have outlined would amount to an invasion of a province which is not ours.

Affirmed.